## ELIZABETH WOOD *et al.*

### *v.*

## SAMUEL THORNLY *et al.*

1. ATTORNEY AND CLIENT—*privileged communications.* Where a party consults with an attorney as his legal advisor in regard to matters out of which litigation afterwards arises, communications thus made to the attorney are inadmissible as evidence against the party seeking the advice. The rule is, that such communications are the privilege of the client, and not of the attorney.

2. STATUTE OF FRAUDS—*parol sale of land—part performance by the purchaser.* The owner of a farm resided thereon with his two sons, the latter having remained with their father and assisted in the cultivation of the farm, and making valuable improvements thereon, for some years after their majority. While so in the occupancy of the farm, the father made a parol agreement with his sons, to convey a certain portion of it to them. The

conveyance was never made, but soon after the parol promise the father refused to perform it.   No labor was done on the farm by the sons after the agreement, beyond what they were fully compensated for by the rents and profits, nor did they make any improvements thereon after that time except such as ordinary husbandry required, and even those were made with the knowledge that the father had refused to execute the agreement.   The consideration for the agreement was the past services of the sons, and an understanding that they would furnish their father with a home during his life, and furnish him a horse to ride, and that the sons would purchase the personal property on the farm.   It was *held*, upon bill filed for a specific performance, that there was no such partial performance on the part of the sons as would take the case out of the statute of frauds.

3.   The possession of the sons after the parol promise to convey could only be referred to their former possession, and could not therefore be invoked to relieve the case from the operation of the statute of frauds.

4.   It is not enough that a party seeking to enforce a parol agreement to convey, was previously in possession under a lease or in any other manner, but it must affirmatively appear that he got possession under the agreement relied on, and in part performance of it.

5.   And where improvements made are relied on as helping to take the case out of the statute, it must distinctly appear that they were made under the contract itself, and not otherwise.

Writ of Error to the Circuit Court of Morgan county ; the Hon. Charles D. Hodges, Judge, presiding.

Messrs. Ketcham & DeLeuw, for the plaintiffs in error.

Messrs. McClure & Stryker, for the defendants in error.

Mr. Justice Scott delivered the opinion of the Court:

The court ruled correctly in sustaining the privilege of the witness Springer.   The relation of attorney and client was shown to have existed at the time between the witness and Ralph Thornly, whose declarations were sought to be called out by the question propounded to the witness.   The rule is, that it is the privilege of the party asking the advice, and not of the attorney, and the witness was correct in declining to answer.   *The People* v. *Barker,* 56 Ill. 299.

The principal question to which our attention has been called, is whether there has been such performance of the parol

contract alleged, and upon which the cross bill is grounded, as will take the case out of the scope of the statute of frauds.

The main facts appearing in the record bearing upon the solution of this question, may be briefly stated : In 1864, the defendants, Samuel and Hugo Thornly, resided with their father, Ralph Thornly, on his farm, and had so resided with him from the time they respectively became of age, and worked on the farm, making valuable improvements. The farm consisted of thirteen forties, making 520 acres, a part of which had been placed in a good state of cultivation, principally through the personal labor of the defendants. In the work of preparing the land for farming purposes, they were assisted by hands hired and paid for their services by the father. The buildings of a permanent character, were erected and paid for by the father, with the proceeds realized from the products of the farm, as the same was gradually brought into cultivation. It does not appear that the work that was done on the farm previous to the year 1864, by the defendants, was performed under any special arrangement or agreement with their father. Hugo was married, and with his wife resided on the farm in the family residence. Samuel was never married. Ralph Thornly was,.and had been for many years, a widower, and the wife of Hugo took charge of and managed the domestic affairs of the homestead. Samuel was the older of the two brothers, and had worked on the farm after he became of age, for some twenty years or more; but Hugo, being much the younger, did not work near so long.

It appears that the defendants had their living off the farm, and had acquired some separate property. during the period they so worked for their father.

Previous to the making of the alleged contract, it appears that Samuel became dissatisfied with his situation on the farm, and was about to, or perhaps did, leave for the purpose of working for himself. His father sent for him to return, and upon his return, it is insisted that the contract relied upon was entered into between the parties.

The substance of that contract is, that Ralph Thornly agreed with his two sons, Samuel and Hugo, in consideration of their past services, and for the further consideration that they would furnish him a permanent home in the family so long as he should live, and would also furnish him a riding horse whenever he desired it, and for the further consideration that the sons would take the personal property on the farm and pay him for the same at the appraised value, he would make them a deed for twelve forties of the farm, reserving the forty on which the family residence stood, during his life time, and at his death it was agreed that it should also go to his two sons, Samuel and Hugo.

It was agreed that the father should go to town and execute the proper conveyances. The personal property was immediately appraised under the terms of the agreement, and was taken into the control of and paid for by the defendants. The contract was by parol, and was entered into in April, 1864. Soon after the making of the alleged contract, the parties went to the office of the witness Springer, to have the necessary papers prepared, and a deed and lease were prepared, and which appear as exhibits in the cause.

Some misunderstanding arose between the parties as to the meaning of the contract, and what the sons were to do for him, while still in the office of Springer, when Ralph Thornly inquired of Springer whether the papers that had been prepared would be binding on him unless he signed them, and upon being answered in the negative, he declared in terse and most emphatic language that he never would sign them, and the papers were never executed.

The defendants, however, continued in possession of the farm, working it as their own, paying the taxes and retaining the proceeds to their own benefit. The improvements that were made by the defendants after the making of the alleged contract, were not of any very considerable value, and were only such as related to ordinary husbandry. The defendants continued to hold possession of the farm up to the time of the

death of their father, which occurred in the month of February, 1867.

In March, after the death of Ralph Thornly, the original bill in this cause was filed by the other heirs, for partition of the lands of which he died seized, and the defendants filed their cross bill, in which they alleged the verbal contract substantially as above set forth, and asked a specific performance.

The defendants to the cross bill, in their answer, deny all the material allegations, and plead the statute of frauds to the alleged contract, and insist that, if any such contract was ever made, it was not valid and binding in law.

We now recur to the question suggested at the outset, and proceed to inquire whether there has been such performance, or part performance, of the contract, on the part of the defendants, with the knowledge and consent of the father, as would take the case out of the operation of the statute of frauds, if it be admitted that the contract was entered into, as alleged by the defendants themselves.

That a parol contract for the sale of land will be enforced in equity, under certain circumstances, notwithstanding the statute of frauds, is now the settled law. Even a promise of a gift of land by the father to the son, where the promise has been acted upon, and has induced the expenditure of money and the making of permanent and valuable improvements, with the knowledge and consent of the promisor, has been enforced in equity, on the ground that it would be inequitable to permit the promisor to retract or refuse to execute the agreement. *Tyler* v. *Eckhart,* 1 Binn. 378 ; *Kurtz* v. *Hibner,* 55 Ill. 514.

But in all cases of a parol contract for the conveyance of land, there must be such a performance as will take the contract out of the statute of frauds. The courts have no right to construe the statute of frauds so as to destroy its meaning. If the statute establishes a hard and inequitable rule, it is the province of the legislature, and not of the courts, to repeal

it. We are satisfied that it establishes a wholesome and salutary rule in its application to the transaction of the affairs of life. In its practical operation, it conduces far more to the prevention of wrongs, through frauds and perjuries, than it works injury in particular exceptional cases.

Where, however, there has been a part performance of the contract, in some instances equity will regard the contract as perfected, so as to take it out of the statute of frauds. Mr. Adams, in his work on equity, calls it the "doctrine of part performance," and says " its principle appears to be that, if one of the contracting parties induce the other so to act, if the contract be abandoned he can not be restored to his former position, the contract must be considered as perfected in equity, and a refusal to complete it in the nature of a fraud." Adams' Eq. 86.

It must appear that the acts relied on as part performance of a contract within the statute of frauds, were done under the contract itself, and for the sole purpose of performing it, otherwise they will not operate to defeat the statute. For, as Mr. Story lays down the rule, if they are acts which might have been done with other views, they will not take the case out of the statute, since they can not properly be said to be done by way of part performance of the agreement. Story Eq. Jur. sec. 762.

To constitute such performance as will avoid the statute, it must clearly and distinctly appear that the party entered into possession under the agreement itself, and was allowed and induced to make expenditures of money, and to make valuable and permanent improvements. The mere possession of land, under a parol agreement of sale, even with the superadded fact of valuable improvements, will not be deemed part performance, if the possession was obtained otherwise than under the contract.

The text writers all agree in laying down the rule that, in order to take a case out of the statute, it is not only indispensable that the acts done should be clear and definite, and

referable exclusively to the contract, but the contract should also be established by competent proofs to be clear, definite and unequivocal in all its terms. Story Eq. Jur. sec. 764.

It has been repeatedly held that it is not sufficient that the party was previously in possession under a lease or in any other manner, but that it must affirmatively appear that such party got possession under the agreement relied on, and in part performance of the same, and it must distinctly appear that the improvements were made under the contract itself, and not otherwise. Toe v. Toe, 3 Grant's Cases, 74.

In the case under consideration, it is not pretended that the defendants obtained possession of the premises under the parol contract insisted upon. They were in possession for long years anterior to the date of the alleged contract. It can not be fairly said that they took possession in part performance of the contract. Under the well known rules of law, their possession must be referred to their former possession, and can not be invoked to relieve the case from the operation of the statute of frauds. We are not aware of the existence of any case that holds the contrary doctrine.

It does not appear that the defendants, after 1864, the date of the alleged contract, made any considerable improvements on the farm. The improvements made after that date were of comparatively little value, and were certainly far more than compensated by the rents and profits enjoyed by them. There is no evidence of any expenditure of money under the contract. The improvements that were made, and the labor that was expended, were mostly anterior to the date of the parol agreement, and are not, therefore, referable to that contract as having been done under and in fulfillment thereof. We are unable to discover, from the evidence, that the defendants were induced by the contract to make any improvements on the farm, over and above what was required by ordinary husbandry, for which they were amply compensated by the rents and profits. The fact that the defendants labored for their father from the time they became of age until the making of the contract, does not

materially affect the law of the case.    Those services were
rendered anterior to and not in performance of the contract
insisted upon, and can not avail to take the contract out of the
statute of frauds.    If they rendered valuable services for their
father in his life time, the law afforded them a complete remedy,
and if, by reason of neglect, they have lost the right of action, the
consequences must rest upon themselves.    There is no principle
of law, with which we are familiar, by which the value of the
services of the defendants could be made a charge on the lands
of the intestate.

But if it be conceded that the defendants did make improve-
ments on the premises during the time they so occupied the
same under the contract, it most distinctly appears that they
did so with the full knowledge that Ralph Thornly did not
intend to perform the contract as they now allege it.    The
defendants were not deceived by Ralph Thornly in that regard.
It was but a few days subsequent to the making of the contract,
that the parties all met at Springer's office, and it appears that,
at that time, the elder Thornly most emphatically declared he
never would execute the deed.    The defendants knew full well
the character of their father, that what he purposed he per-
formed, and if, after that explicit notice, they did make
improvements on the premises, they did so with the full knowl-
edge that the contract was not to be performed.

The subsequent relations of the parties show conclusively
that Ralph Thornly did not acquiesce in the continued occu-
pancy of the farm by the defendants.    His relations with them
became unfriendly, and particularly so with Samuel.    He once,
and perhaps twice, served them with notice to quit the farm.
The unfriendly relations between the parties at length culmin-
ated in the violence that occasioned the death of Ralph
Thornly.    The facts in evidence leave no doubt on the mind
that he never did consent to the occupancy of the farm by the
defendants, during the time they did so occupy it.    It is not
possible that the defendants did not know that they were
occupying the farm without his consent, and not in fulfillment

of any pretended agreement of purchase. The whole facts in evidence rebut the idea that the defendants were occupying the farm in fulfillment of an agreement to purchase the same. If we should give such a construction to this evidence, it would, in effect, deprive Ralph Thornly, if living, of his property against his will, and without any consideration. A court of equity will not lend its aid for any such purpose.

There is no analogy between the facts in this case and the cases in this court to which our attention has been called, where the court has held that a verbal contract may be enforced in a court of equity, notwithstanding the statute of frauds.

In the case of *Kurtz* v. *Hibner, supra,* the party was let into possession of the property under the contract, and was allowed to make valuable improvements, under the belief that the contract would be completed, and this was said to be such performance as would take the case out of the statute. But the facts in this case are totally different. Here the parties were previously in possession, and made no improvements whatever after the making of the alleged contract, before they were informed that the contract would not be executed. The possession was not referable to the contract, and the continuance in the occupancy was not by the consent of the promisor.

The case of *Fitzsimmons* v. *Allen's Heirs,* 39 Ill. 440, simply holds that, where the consideration has been fully paid, and the possession given to the purchaser, it is sufficient performance to take the case out of the statute of frauds, notwithstanding there was no written evidence of the sale. The doctrine there asserted can have no possible application to the facts of the case under consideration. In this instance, the parties were not let into possession under the contract, and there is no pretense that they paid any part of the purchase money after and in consequence of the making of the contract. The consideration insisted upon consisted of past services that had been rendered without any reference whatever to the contract.

The case of *Ramsey* v. *Liston*, 25 Ill. 114, holds the same doctrine as *Fitzsimmons* v. *Allen, supra,* and can have no application to the facts of the present case.

After a most careful examination, we can see nothing in all this record that will take the case out of the statute of frauds. There has been no such performance of the contract as would authorize a court of equity to enforce it as against the other heirs of the intestate.   The case is barren of every feature that would bring it within the equitable jurisdiction of the court. It is not a case where a court of equity will interfere to suspend the operation of the statute of frauds on the ground that the contract has been perfected.   The statute was enacted for wise and beneficent purposes, and this case affords a practical example where its operation promotes the ends of justice.   The case, in all its features, is within the plain meaning of that statute, and it must be held to constitute an effectual bar to the relief sought on the cross bill.

The court should have dismissed the cross bill, and decreed partition on the original bill.

For the errors indicated, the decree of the circuit court must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*